UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 08-CV-11672-RGS

MARK O'BRIEN

v.

RICHARD ROBBINS

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

January 19, 2010

STEARNS, D.J.

On June 27, 2008, Mark O'Brien, a Reading Police Sergeant, filed this lawsuit in Middlesex Superior Court against his former supervisor, Lieutenant Richard Robbins, alleging violations of the First Amendment right to free speech. The matter was removed to this court on September 30, 2008, on federal question grounds. Presently before the court is Robbins' motion for summary judgment. A hearing on the motion was held on January 15, 2010.

BACKGROUND

O'Brien joined the Reading Police Department in 1983. He has served as a Sergeant for nineteen years.[1] It is undisputed that O'Brien and Robbins have had a long-

---

[1] O'Brien is also a member of the Massachusetts bar.

standing acrimonious relationship.[2] At some point prior to April of 2006, O'Brien learned that Robbins was having an affair with Cheryl Johnson, the Reading Town Clerk. O'Brien also knew that Robbins lived with a different woman, who is the mother of Robbins' child.

On April 7, 2006, James Cormier, the Chief of Police, called O'Brien into his office. The Chief informed O'Brien that Johnson had complained about his chatting with poll workers during an election night police detail.[3] Johnson had requested that O'Brien not be assigned to any future election details. On being told of Johnson's complaint, O'Brien informed Chief Cormier that Robbins and Johnson had carried on a romantic relationship for several years. Cormier told O'Brien that he was aware of the relationship and had cautioned Robbins about it in the past.

Immediately following his meeting with the Chief, O'Brien observed Johnson enter the station. At his deposition, O'Brien recalled,

> Now [Johnson's] complaining about my work, so I'm having this conversation with the Chief. . . . So then I go back downstairs. Next thing I know, Johnson comes in the office, right, she walks through, you know, gives me a look like, you know something, I own this place, and I'm sitting here going, you know something, I can't do this anymore. I have no idea, is she going to make another complaint against me?

O'Brien Dep. at 25. When he saw Johnson, O'Brien's heart began to race. He left the station, telling his colleagues that he was taking sick time to deal with stress.

---

[2] The parties agree that they have had a difficult relationship since the early 1990's. According to O'Brien, the conflict began with an incident in 1993 (the details of which are not important for present purposes) that led to O'Brien's being reprimanded. For reasons unexplained, O'Brien believes that Robbins was somehow embarrassed by the incident.

[3] According to Robbins, Johnson complained that O'Brien was absent from his detail for an extended period of time.

Several weeks later, on April 25, 2006, Johnson paid another visit to Robbins at the station while O'Brien was working the night shift. Johnson waved to O'Brien as she walked past his office. O'Brien's heart began to pound and he felt renewed stress pangs.

The following day, April 26, 2006, O'Brien sent Chief Cormier an email detailing the substance of their April 7 meeting. O'Brien stated,

> [Johnson] is constantly inside the station while Lt. Robbins is working, sometime for hours. . . . Lt. Robbins lives with another woman, and both women . . . come to the station. Sooner or later the two will meet. [Robbins' live-in girlfriend] may not be as understanding of the situation as some might think. The two women also phone the station and I find myself bobbing and weaving, trying to be friendly yet evasive, until I can ascertain their identity so as not to call one by the other's name. Cheryl Johnson's presence in the station is causing me great anxiety.

O'Brien reiterated to Chief Cormier, "I told you that I was not in a position to make demands from you. I am 'OLD SCHOOL' and like to keep things in house. . . . I am also making every effort to keep all correspondence between yourself and I, so as to allow you the opportunity to resolve this matter." O'Brien stated that he believed the only reason that Johnson visited the station was to "harass and humiliate" him. He requested that Johnson be prohibited from coming into the station while he was working.[4]

---

[4] The lengthy email disclosed numerous other details regarding Robbins' relationship with Johnson. O'Brien stated that several years earlier, Johnson had approached him and told him that she was dating a married man. According to O'Brien, when he eventually told his wife about this comment, it "affected [his] marital relationship because [his] wife is upset that [he] was not candid with her to begin with." In addition, at a point before O'Brien was aware that Robbins was in a relationship with Johnson, he told Robbins to watch out for Johnson because she was not "all there." O'Brien described how during the summer of 2005, he asked another officer to tell Robbins that his relationship with Johnson was unsettling to him and others in the Department. O'Brien reminded Chief Cormier that Robbins at one time ordered an officer to transport an intoxicated Johnson from a restaurant to her home without noting it in the transport log. O'Brien also informed Chief Cormier of his belief that Robbins was the instigator behind Johnson's complaint

3

At some point after O'Brien complained, Chief Cormier hired a private law firm to conduct an investigation into Robbins' relationship with Johnson. The investigating attorney found that while Robbins was not responsible for creating a hostile work environment (under Massachusetts law), his involvement with Johnson had discomfited several Department employees. On June 23, 2006, Chief Cormier issued a written reprimand to Robbins citing his arranging unlogged transportation home for Johnson and for socializing with her at the station while on duty.

O'Brien claims that Robbins retaliated against him by torpedoing his chance of a promotion to lieutenant. On June 26, 2006, three days after Robbins was reprimanded, O'Brien received an Employee Performance Evaluation in which Robbins rated O'Brien as "need[ing] improvement" in the category of "supervisory capability." According to O'Brien, Robbins had over the previous two years consistently rated him as "meet[ing] expectations" in this category. In O'Brien's opinion, he should have been promoted to lieutenant before Peter Garchinsky (the officer who received the promotion). In addition, O'Brien claims that evidence in some of his cases has been intentionally tampered with and/or mishandled by the Detective Division, which is supervised by Robbins.

## DISCUSSION

---

about his election detail behavior because of the upcoming promotional exams. O'Brien further opined that Johnson was trying to harm his reputation out of fear that he would embarrass her, as he claimed to have information about her previous relationships that "might be construed as offensive to future suitors if it became known." Finally, O'Brien reminded Chief Cormier of another love triangle in the Department and of his contentious history with Robbins.

The First Amendment protects a public employee's right, in prescribed circumstances, to speak freely as a citizen on matters of public concern. See Connick v. Myers, 461 U.S. 138, 146 (1983). However, there is not "a constitutional cause of action behind every statement a public employee makes in the course of doing his or her job." Garcetti v. Ceballos, 547 U.S. 410, 426 (2006). Rather, only certain "contributions to the civic discourse" are entitled to protection. Id. at 422. The first question to ask is whether the employee spoke as "a citizen addressing matters of public concern." Id. at 417. As the First Circuit has noted, "this first step itself has two sub-parts: (a) that the employee spoke as a citizen and (b) that the speech was on a matter of public concern." Curran v. Cousins, 509 F.3d 36, 45 (1st Cir. 2007). If either of these preliminary inquiries is answered in the negative, "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." Garcetti, 547 U.S. at 418.

If a public employee passes this first hurdle, he next must show that, "when balanced against each other, the First Amendment interests of the [employee] and the public outweigh the government's interest in functioning efficiently." Jordan v. Carter, 428 F.3d 67, 72 (1st Cir. 2005). "The problem in any case is to arrive at a balance between the interests of the [plaintiff], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will County, 391 U.S. 563, 568 (1968). Finally, the plaintiff must show that some adverse employment action flowed from his speech. Each of these inquiries involves questions of law for the court's determination. Connick, 461 U.S. at 148 n.7. If a plaintiff

5

satisfies each of the prerequisites, he is then entitled to a jury's determination of whether his "protected speech was a substantial or motivating factor in the adverse action against him." Id.

In answering the threshold question of whether the implicated speech involves a matter of public concern, the court must determine whether O'Brien's expression can fairly be thought to relate to "any matter of political, social, or other concern to the community." Connick, 461 U.S. at 146. This is a case-specific, fact-dependent inquiry, Curran, 509 F.3d at 45, in which the court must look to the "content, form, and context of a given statement as revealed by the whole record." Connick, 461 U.S. at 147-148. "[P]ublic-employee speech on a topic which would not necessarily qualify, *on the basis of its content alone*, as a matter of inherent public concern (e.g., internal working conditions, affecting only the speaker and co-workers), may require a more complete Connick analysis." O'Connor v. Steeves, 994 F.2d 905, 914 (1st Cir. 1993) (emphasis in original).

O'Brien argues that he spoke on a matter of public concern because of the possibility that Robbins' two girlfriends might accidentally meet in the station and become involved in an altercation creating a public safety hazard. He also argues that the distraction to co-workers caused by Robbins' relationship with Johnson is a matter of potential public concern. As to the latter proposition, while the public might have a prurient interest in Robbins' romantic entanglements, their disclosure "does not even approach matters of inherent public concern in the context of law enforcement, such as official malfeasance, abuse of office, and neglect of duties. [O'Brien's] claims . . . do not implicate the ability of [Department] personnel to carry out their responsibility to the public, i.e., the

provision of competent law enforcement services." Rosado-Quinones v. Toledo, 528 F.3d 1, 5 (1st Cir. 2008) (internal quotation marks and citation omitted).

As to the former, O'Brien testified that the relationship "was going to affect people inside my department and it was going to affect people that may come into the police station, which should be a safety or a buffer zone." O'Brien Dep. at 29-30.[5] While the court agrees that the tranquility of the station might be compromised if Robbins' two girlfriends were to cross paths, the spectre of a dire threat to public safety would seem wildly overblown, and in any event, "diminished by [O'Brien's] preoccupation with personal disagreements and internal . . . workings of the [Department]." Mullin v. Town of Fairhaven, 284 F.3d 31, 39 (1st Cir. 2002).  The court cannot help but note that if O'Brien had been truly concerned about public safety, he would have demanded that Johnson be banned from the station at all times, not just when he was working his shift.

The court must also "examine the extent to which plaintiff[] intended [his] speech to contribute to any public discourse, or if it simply reflected personal or internal [Department] concerns." Mullin, 284 F.3d at 38.  O'Brien's email to Chief Cormier emphasized that he wanted to keep the matter private and "in house."  In an answer to an interrogatory seeking the reasons for his complaint to Chief Cormier, O'Brien made it clear that his report to the Chief was motivated by personal concerns. O'Brien stated,

> I complained to . . . Chief Cormier, because Cheryl Johnson complained to him about my performance at the election detail on 4-4-06. . . . When Chief Cormier confronted me about her complaint I had to explain the relationship

---

[5]O'Brien analogizes the potential threat to a 1986 incident at the Reading Public Library in which a man murdered his wife.

> to him to defend myself against her allegations. . . . Their relationship was affecting my ability to work details and provide for my family.

Answer to Interrogatory No. 6.[6]  At O'Brien's deposition, Robbins' counsel asked him

> Q: I understand that you didn't want to make this a public thing; is that fair?
>
> A: Yeah.

O'Brien Dep. at 216-217.  He testified, "Everybody wants to be – everybody thinks you're a John Wayne down there.  You're not.  You're Mark O'Brien, you got kids and a family and you're trying to make ends meet, and this guy is starting to create a hell for me, okay, and it's gotta stop . . . ."  O'Brien Dep. at 51-52.  "[I]t's one cop to another, but in some way I wanted to protect myself."  Id. at 217.

"[T]he First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs."  Connick, 461 U.S. at 149.  When a public employee speaks as an employee upon matters only of personal interest, "a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency." Id. at 147.  The record illustrates that O'Brien was acting to defend himself from Johnson's complaint, rather than "to provide members of society with information necessary to make informed decisions about government operations, to disclose public misconduct, or to inspire public debate on a matter of significant public

---

[6]O'Brien also expressed this sentiment in his comments objecting to Robbins' negative evaluation in 2006.  O'Brien wrote, "I believe Lt. Robbins and Cheryl Johnson crossed a line and went after my ability to provide financial support for my wife and five children by lodging a complaint which lacked substance.  I can no longer sit back and allow Lt. Robbins and/or Cheryl Johnson to interfere with my ability to provide financial support (details) for my family which I take a tremendous amount of pride in."

interest." Meaney v. Dever, 326 F.3d 283, 289 (1st Cir. 2003).  O'Brien is "hard pressed to elevate the First Amendment stakes by invoking the interests of the community in a public discourse that [he] appear[s] to have done so little to foster." Mullin, 284 F.3d at 39-40.

"In the past [the First Circuit has] cautioned against allowing the inherent public concern category to draw too many types of cases within its gravitational pull." Davignon v. Hodgson, 524 F.3d 91, 101 (1st Cir. 2008).  The court declines to do so here.  The court finds as a matter of law that O'Brien in complaining to the Chief was not speaking as a citizen on a matter of public concern, but as an employee pursuing a work-related grievance against a co-worker with whom he has a contentious relationship.  To the extent that the complaint might be interpreted as a warning to the Chief of a breach of decorum that might tarnish the Department's reputation, O'Brien was doing no more than discharging his duty (as he conceived it) to guard the morals and morale of the Department.  "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti, 547 U.S. at 421.[7]

---

[7] While the court need go no further, it notes that O'Brien has not identified an actionable adverse employment action.  It is undisputed that O'Brien and Robbins have had an antagonistic relationship since the 1990's.  To be sure, Robbins is no candidate for sainthood.  He admitted at his deposition that he does not like O'Brien, Robbins Dep. at 39-40, and that he was angry with O'Brien for causing him to receive the written reprimand. Id. at 118.  Although O'Brien's 2006 evaluation, which O'Brien claims has compromised (or will compromise) his eligibility for promotion, was written only three days after Robbins was reprimanded, there is nothing in the record to suggest that the evaluation in any way has negatively impacted O'Brien's conditions of employment.

<u>ORDER</u>

For the foregoing reasons, defendant's motion for summary judgment will be <u>ALLOWED</u>. The Clerk will enter judgment in favor of defendant Robbins and close the case.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

---

Robbins gave O'Brien an "exceeds standards" rating for customer service and a "meets standards" in eleven other categories. Although the First Circuit has stated that three negative performance evaluations and a related extension of a plaintiff's probationary period would suffice for summary judgment purposes, see <u>Guilloty Perez v. Pierluisi</u>, 339 F.3d 43, 58 (1st Cir. 2003), "negative performance evaluations, standing alone, cannot constitute an adverse employment action." <u>Sweeney v. West</u>, 149 F.3d 550, 556 (7th Cir. 1998). O'Brien's only "needs improvement" was in the area of supervisory capacity, where Robbins opined that O'Brien was not sufficiently disciplining one particular officer. (The record is devoid of O'Brien's evaluation for the three years between 2007 and 2009). Moreover, Garchinsky, who was also a Sergeant and who is the only person whom O'Brien has identified as someone less deserving of a promotion than he, had the same civil service score as O'Brien and had a three-years advantage in seniority. It is, moreover, undisputed that Lt. Robbins was not involved in the promotional process. O'Brien is (perhaps justifiably) frustrated with his persisting negative relationship with Robbins. However, "the most that [O'Brien's] allegations support is either a finding that [Robbins] had a personal vendetta against [him] or that [he] was treated unfairly. Those claims of personal conflict and unfair treatment . . . are insufficient" to show unconstitutional retaliation. <u>Maymi v. Puerto Rico Ports Auth.</u>, 515 F.3d 20, 29 (1st Cir. 2008).